IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ROTISH V. SINGH,

                            Plaintiff,

                v.

SUE WASHBURN, Food Service Manager, *et al.*,

                          Defendants.

Case No. 2:14-cv-01477-SB
2:16-cv-01957-SB
2:17-cv-00829-SB

**OPINION AND ORDER**

**BECKERMAN, U.S. Magistrate Judge.**

Rotish Singh ("Singh"), an adult in custody of the Oregon Department of Corrections ("ODOC"), brings these consolidated 42 U.S.C. § 1983 actions against several ODOC employees ("Defendants"). In his complaints, Singh alleges that various defendants violated his First and Eighth Amendment rights by denying him proper medical care, retaliating against him for filing prison grievances, and subjecting him to unconstitutional conditions of confinement.

Now before the Court are Defendants' motions for summary judgment and Singh's renewed motions for a court-appointed expert. *See* FED. R. CIV. P. 56; FED. R. EVID. 706. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, and the parties have consented to the jurisdiction of a U.S. Magistrate Judge pursuant to 28 U.S.C. § 636(c). For the

reasons explained below, the Court grants Defendants' motions and denies Singh's renewed motions.[1]

## BACKGROUND[2]

### I.      SINGH'S PRISON AND MEDICAL RECORDS

Singh was admitted into ODOC custody in April 1998 and currently resides at the Oregon State Correctional Institution ("OSCI"). (Decl. of Sue Washburn in Supp. of Defs.' Mot. Summ. J. ("Washburn Decl.") ¶ 3, ECF No. 175.) Singh also resided primarily at the Two Rivers Correctional Institution ("TRCI") between February 2010 and November 2017. (Washburn Decl. ¶ 3.)

#### A.      Case No. 2:14-cv-01477-SB

##### 1.      Singh's Initial Exposure to Mold

Between November 2011 and June 2012, Singh worked for TRCI's food services in the "tortilla room." (Washburn Decl. ¶ 4.) Singh's "duties included making tortillas and performing general cleaning that included sweeping the flour and other debris from the floor." (Washburn Decl. ¶ 4.)

On March 27, 2012, TRCI's maintenance crew (the "Physical Plant crew") replaced the kick plate on the tortilla room's cooler because they discovered mold behind the old kick plate. (Washburn Decl. ¶ 5.) The Physical Plant crew "heavily saturated" the mold with bleach before

---

[1] The Court cites only to the motion papers from the lead case because the parties submitted consolidated briefing (i.e., the motion papers are identical); treats Singh's amended response and declaration (ECF Nos. 221-22) as his operative motion papers (Singh's exhibits are located at ECF No. 218-1, at 1-417); and refers to some of the individual defendants only by their last name and job title because the record does not include some of the defendants' first names.

[2] Unless otherwise noted, the following facts are either undisputed or presented in the light most favorable to Singh.

performing any work. (Washburn Decl. ¶ 5.) They also had an Occupational Safety and Health Administration ("OSHA") consultant provide step-by-step guidance over the phone. (Am. Decl. of Rotish Singh in Supp. of Pl.'s Resp. to Defs.' Mot. Summ. J. ("Singh Decl.") ¶¶ 8-9, ECF No. 222.)

Singh did not assist the Physical Plant crew in repairing the kick plate or removing any mold. (Washburn Decl. ¶ 5.) Singh did, however, clean and sanitize the tortilla room without any protective gear on March 27, 2012, after the Physical Plant crew finished their work. (Singh Summ. J. Ex. ("Singh Ex.") 1, at 1, ECF No. 218-1, at 2.) During Singh's shift, a fan was running inside the tortilla room to "fan out the dust" remaining from the earlier repair work. (Singh Ex. 1, at 1.)

Over the next few months, Singh—who has allergies and a medical history that includes a positive purified protein derivative ("PPD") test for tuberculosis and complaints of "chronic upper respiratory discomfort," headaches, rash, watery and itchy eyes, shortness of breath, difficulty breathing, stomach issues, and chest pain—complained on numerous occasions to TRCI's medical staff about chest pain, shortness of breath, coughing up small amounts of blood, and headaches "especially during work." (Singh Decl. ¶¶ 21-33; Decl. of Christopher DiGiulio in Supp. of Defs.' Mot. Summ. J. ("DiGiulio Decl.") ¶¶ 7, 9-10, 14-30, ECF No. 178.) As a result, TRCI's medical staff (1) examined Singh several times; (2) referred Singh to a physician, defendant Bennette Norton, M.D. ("Dr. Norton"), who diagnosed Singh with an upper respiratory infection ("URI") and prescribed an inhaler and several rounds of antibiotics; (3) ordered lab and blood work, which showed an elevated white blood count and bacterial infection in Singh's stomach; (4) ordered an x-ray of Singh's chest, which was "[n]egative" and showed that Singh's lungs were "clear and expanded"; and (5) ordered an electrocardiogram ("EKG"),

which revealed that Singh had a "normal sinus rhythm." (Singh Decl. ¶¶ 23-33; DiGiulio Decl. ¶¶ 15-30.)

### 2.    Nurse Smith's Examination

On July 20, 2012, Singh visited a nurse, defendant S. Smith ("Nurse Smith"), complaining of food poisoning symptoms, "chest pains when breathing," stuffy nose, headaches, and throwing up blood. (Singh Decl. ¶ 34; DiGiulio Decl. ¶ 31.) Nurse Smith noted that Singh exhibited "wheezing" in his lungs, provided Singh with a salt packet to gargle, and instructed Singh to purchase "*Claritin* from the Commissary for allergies." (Singh Decl. ¶ 34; DiGiulio Decl. ¶ 31.)

Over the course of the next year, Singh visited TRCI's medical staff almost every month, exhibiting signs of wheezing and complaining about Dr. Norton's URI diagnosis, as well as fatigue, small amounts of blood in his saliva, chest pain, and shortness of breath that improved with an inhaler, all of which Singh attributed to his exposure to mold in the tortilla room. (Singh Decl. ¶¶ 35-61.) After Nurse Smith examined Singh, a different nurse, defendant Dieter ("Nurse Dieter"), determined that Singh's reported symptoms were related to his "resolving URI." (Singh Decl. ¶ 35.)

When Singh did not improve, TRCI's medical staff responded by (1) taking a throat culture, which was "negative for infection"; (2) ordering another x-ray of Singh's chest, which was "[n]egative" and showed that Singh's lungs were "clear and expanded"; (3) examining Singh several times; (4) providing Singh with more salt packets; (5) renewing the medication Singh uses to treat his gastroesophageal reflux disease ("GERD"); (6) ordering additional blood work, which continued to show that Singh had elevated white blood count levels; (7) referring Singh back to Dr. Norton, who diagnosed a URI and prescribed another round of antibiotics; and (8) referring Singh to Daniel Dewsnup, M.D. ("Dr. Dewsnup"), an infectious disease specialist,

who diagnosed Singh with inflammatory bronchitis that may or may not (i.e., "+/-") have been exacerbated by "fungal exposure," advised Singh not to smoke, and provided Singh an antidiarrheal for stomach issues. (Singh Decl. ¶¶ 36-60; Singh Ex. 4, at 21; DiGiulio Decl. ¶¶ 32-33.)

Dissatisfied with the medical care he received and the lack of improvement in his respiratory symptoms, Singh filed a formal grievance against Nurse Smith on June 17, 2013. (Singh Decl. ¶ 61.) During the grievance appeal process, an ODOC medical director, defendant Steven Shelton, M.D. ("Dr. Shelton"), examined Singh, diagnosed Singh with asthma, and recommended increased usage of his steroid inhaler. (Singh Decl. ¶ 62; Singh Ex. 4, at 27-28.) Nurses also examined Singh based on his complaints of wheezing, and one of them advised Singh to use his inhaler "daily as prescribed" and the other noted that Singh had not filled his inhaler in over a month and needed to use it "more frequently." (Singh Decl. ¶¶ 66, 69; Singh Ex. 4, at 30, 37.)

On November 22, 2013, an ODOC assistant director of operations, defendant Michael Gower ("Gower"), rejected Singh's second-level grievance appeal against Nurse Smith, Dr. Shelton, and a nurse manager, defendant Perkins ("Nurse Perkins").[3] (Singh Decl. ¶ 70; Singh Ex. 2, at 13.)

**B.    Case No. 2:16-cv-01957-SB**

**1.    Dr. Norton's Treatment in July and August 2014**

On July 29, 2014, Singh went to sick call to complain about his "ongoing shortness of breath and severe and allergic asthmatic reactions." (Singh Ex. 2, at 14.) Singh also asked to be

---

[3] Singh's only remaining claim in the lead case, Case No. 2:14-cv-01477-SB, is an Eighth Amendment claim against Nurse Smith, Dr. Shelton, Nurse Perkins, and Gower for deliberate indifference to serious medical needs. (*See* Singh Decl. ¶ 70, acknowledging that this Eighth Amendment claim is the only one remaining in the lead case).

seen by a lung specialist based on his continued belief that his ongoing symptoms were related to exposure to "toxic black mold." (Singh Ex. 2, at 14.) The medical staff informed Singh that Dr. Norton reviewed his case and did not recommend alterations to Singh's treatment. (Singh Ex. 2, at 14.)

Nurse Dieter responded to Singh's grievance and noted that Dr. Norton examined Singh on August 13, 2014, and "found no problems with shortness of breath." (Singh Ex. 2, at 16.) Singh, however, continued to complain about being "diagnosed with [URIs] twice" and put on "two different inhaler[s] and medication for allergic reaction[s]," because Singh believed that these "symptoms were caused by [his] exposure to toxic black mold." (Singh Ex. 2, at 17) (caps omitted).

Dr. Shelton responded to Singh's first-level grievance appeal, noting that Dr. Norton's examinations "found that [Singh's] lungs are clear and breathing well," Singh's file reflected a history of asthma and allergies, Singh was given "an Albuterol inhaler and Claritin to help with symptoms of seasonal allergies," and there is "nothing to support an exposure to black mold." (Singh Ex. 2, at 18.)

On March 4, 2015, Gower rejected Singh's second-level grievance appeal.[4] (Singh Ex. 2, at 20.)

## 2.    Mold in Singh's Cell

On September 28, 2014, Singh informed the physical plant manager, defendant Nichols ("Nichols"), that there was "possible black mold" in the wall of his cell and he wanted it removed, cleaned, and sealed. (Singh Decl. ¶ 139.) Nichols responded that cell sanitation is the

---

[4] This grievance related to Dr. Norton's care in July and August 2014 forms the basis of Singh's first claim in Case No. 2:16-cv-01957-SB, which Singh refers to as a claim for "medical deliberate indifference." (Singh Decl. at 25) (bold and caps omitted).

responsibility of the "person in the cell," the Physical Plant crew is a maintenance and "repair shop," and Singh needed to work with his unit manager to obtain cleaning supplies. (Singh Decl. ¶ 139.)

On November 3, 2014, Singh filed a grievance against Nichols for subjecting Singh to "unsafe conditions of confinement." (Singh Decl. ¶ 141.) In response, Nichols noted that housing unit guidelines stated that "'[i]nmates are responsible for the cleanliness of their cell/bunk area including floors, walls, vent ducts, windows, bunk and drawers,'" that the Physical Plant crew is "a maintenance and repair shop," not "a janitorial shop," and that Singh should work with his housing unit officer to address his cleaning needs. (Singh Ex. 2, at 24.)

During the grievance appeal process, the prison staff moved Singh from his cell, inspected Singh's cell, and dispatched crews to clean the mold in Singh's old cell and two other cells and to seal and caulk any areas to prevent any further mold growth. (Singh Ex. 6, at 4; Singh ¶¶ 143-49.)

On March 23, 2015, an administrator, defendant Mark Nooth ("Nooth"), denied Singh's second-level grievance appeal related to the presence of mold in Singh's cell, noting that the officer in charge assigned a cleaning crew to clean Singh's cell and that the Physical Plant crew completed a work order to caulk and re-seal the toilet and sink basin in Singh's cell.[5] (Singh Ex. 2, at 29.)

### 3.    The February 2015 Shower Project

On February 19, 2015, crews started performing demolition and remodeling work on the showers near Singh's cell and used floor fans to circulate the "black dust and noxious smell out

---

[5] This grievance related to mold in Singh's cell forms the basis of Singh's second claim in Case No. 2:16-cv-01957-SB, which Singh refers to as a claim for unsafe "conditions of confinement" due to "exposure to mold." (Singh Decl. at 15) (bold and caps omitted).

of the shower area." (Singh Decl. ¶ 158.) The next month, Singh sent an inmate communication

form (also known as a "kite") to Nichols asking about whether the demolition and cleanup crew

were taking appropriate safety precautions because Singh believed the air quality was a health

and safety risk. (Singh Decl. ¶¶ 159-60.)

On March 15, 2015, ten days after Nichols confirmed that the demolition and cleanup

crew were following ODOC rules, polices, and procedures, Singh filed a grievance against

Nichols based on Singh's "severe asthmatic reactions," difficulty breathing, and exposure to the

air circulating "strong odors of mold debris" during demolition and the maintenance crew's work

on the tiles, grout, crumbling plaster, and leakage in the area. (Singh Decl. ¶¶ 161-64; Singh Ex.

2, at 30-32.)

On March 23, 2015, a safety manager, defendant Lancaster ("Lancaster"), responded to

Singh's claim, noting that he "sealed off the shower area with plastic to insulate any dust [from]

leaving the shower area," he "followed the OSHA standards [for] removing and containing the

area," he "cut the grout in between the tiles" to let the floor dry, and he worked on the project

and "did not see any mold or black mold that was in the shower area or under the tiles." (Singh

Ex. 2, at 33.)

On April 7, 2015, Singh filed a grievance appeal form stating that Nichols and Lancaster

"want to conceal the truth" and he "will add this onto [his] pending lawsuit." (Singh Ex. 2, at

34.) As a result, a grievance coordinator returned Singh's grievance because ODOC rules

prohibit inmates from grieving claims or issues they are pursuing in pending litigation.[6] (Singh

Ex. 2, at 35.)

---

[6] This grievance related to demolition and remodeling of the showers forms the basis of
Singh's third claim in Case No. 2:16-cv-01957-SB, which Singh refers to as a claim for unsafe
"conditions of confinement." (Singh Decl. at 17) (bold and caps omitted).

PAGE 8 – OPINION AND ORDER

### 4.    Singh's Cell Vent and Sink

In January and February 2016, Singh complained to prison and medical staff about a "noxious smell blowing out" of his cell vents and sink, which Singh attributed to mold. (Singh Decl. ¶¶ 189-92.)

Nichols informed Singh that he needed to submit a work order, he did not know why there would be such a smell since "OSHA did not report finding any mold," the smell from the sink could be due to type of plumbing system at TRCI, and the heating, ventilation, and air conditioning ("HVAC") "staff checked the air handling system and did not find anything out of the ordinary[, nor did they] find any sign of mildew or mold anywhere." (Singh Decl. ¶ 193; Singh Ex. 2, at 38.)

On August 5, 2016, an administrator, defendant Steve Franke ("Franke"), rejected Singh's second-level grievance appeal, noting that there was "no evidence of mold in [Singh's] cell vent or in [his] cell sink" and "no information indicating an epidemic pertaining to any health concerns related to mold issues at TRCI."[7] (Singh Ex. 2, at 42.)

### 5.    The March 2016 Shower Project

In March 2016, Singh sent a kite to Nichols noting that crews performed demolition and cleanup work on the showers in unit nine on March 1, March 2, and March 4, 2016, and asking whether the crew followed OSHA standards and ODOC rules and procedures. (Singh Ex. 1, at 22.) Nichols confirmed that crew followed these standards, rules, and procedures. (Singh Ex. 1, at 22.)

///

---

[7] This grievance related to mold in Singh's cell vent and sink forms the basis of Singh's fourth claim in Case No. 2:16-cv-01957-SB, which Singh refers to as a claim for unsafe "conditions of confinement." (Singh Decl. at 21, 23) (bold and caps omitted).

On April 29, 2016, Singh filed a grievance against Nichols for subjecting him to "unsafe condition[s] of confinement." (Singh Decl. ¶ 213.) A physical plant coordinator, defendant Wilson ("Wilson"), responded to Singh's grievance and stated he "followed all safety protocols" during the unit nine shower project and that the unit nine shower area was "totally sealed with plastic and the predator air scrubber with [high-efficiency particulate air] filters [were] in place." (Singh Ex. 2, at 46.)

On August 22, 2016, an acting superintendent, defendant Ridley ("Ridley"), informed Singh that the crew supervisor and adult in custody ("AIC") worker who completed the unit nine shower project "were interviewed," the supervisor and AIC worker "confirmed the area was totally sealed off with plastic sheeting" and ensured that the "plastic was sealed behind them" whenever they entered or exited the work area, the plastic "was sealed around the intake on the predator air filtering machine," and none of the "work was completed during meal periods." (Singh Ex. 2, at 48.)

On October 17, 2016, Nooth rejected Singh's second-level grievance appeal.[8] (Singh Ex. 2, at 50.)

### 6.    Singh's Exposure to Pepper Spray

On August 1, 2016, an ODOC plant coordinator failed to secure a crowbar, which an inmate later used to commit an assault. (Singh Decl. ¶ 221.) Singh filed a grievance because prison officials used pepper spray to disarm the inmate with the crowbar and Singh was exposed to the pepper spray but did not receive medical treatment like other AICs with asthma. (Singh Ex. 2, at 53.)

---

[8] The grievance related to the March 2016 shower project forms the basis of Singh's fifth claim in Case No. 2:16-cv-01957-SB, which Singh refers to as a claim for "[u]nsafe conditions of confinement" and "medical deliberate indifference." (Singh Decl. at 24-25) (bold and caps omitted).

PAGE 10 – OPINION AND ORDER

A nurse manager, defendant Conley ("Nurse Conley"), responded to Singh's grievance, noting that she "reviewed [Singh's] medical health record and [found] no indication that a complaint concerning respiratory symptoms was received from [Singh] on or around the date in question," Singh "could have requested that [his] unit officer contact Health Services for immediate attention," the "sick call process" was also available to Singh, and Singh received a "rescue inhaler on June 11, 2016, which . . . should have been available to [Singh]." (Singh Ex. 2, at 54.) Singh responded that he disagreed with Nurse Conley's findings and claimed that unnamed officials denied him access to medical care when he reported difficulty breathing. (Singh Ex. 2, at 55.)

Dr. Shelton reviewed the matter after Nurse Conley and agreed that there was no documented report of Singh complaining about respiratory symptoms due to pepper spray exposure on August 1, 2016, Singh did not sign up for sick call when it was conducted soon thereafter, and Singh could have utilized his "Ventolin metered dose rescue inhaler." (Singh Ex. 2, at 56.)

On January 24, 2017, a nurse and health services administrator, defendant DaFoe ("Nurse DaFoe"), denied Singh's second-level grievance appeal based on her review of Singh's medical chart and Dr. Shelton's and Nurse Conley's responses.[9] (Singh Ex. 2, at 58.)

### 7.    Singh's August 2016 Sick Call

On August 10, 2016, Singh presented for morning sick call and complained to two nurses, Nurse Dieter and defendant Hodge ("Nurse Hodge"), about sleep deprivation, a bloody nose, difficulty breathing, back pain, irritated eyes, severe headaches, back pain, sciatica in his

---

[9] This pepper spray incident forms the basis of Singh's sixth claim in Case No. 2:16-cv-01957-SB, which Singh refers to as a claim for "denial of medical care." (Singh Decl. at 25) (bold omitted).

left leg, and needing to increase his dosage of Gabapentin. (Singh Ex. 2, at 59-60, 66-67.) Singh filed grievances against Nurses Dieter and Hodge because Nurse Dieter assured Singh that she "would pull [Singh] out for [an] examination" but never ended up doing so. (Singh Ex. 2, at 59, 66.)

Nurse Dieter responded to Singh's grievances and noted that she saw that Singh was "scheduled to see Dr. Norton this month for ongoing pain/breathing issues," she observed Singh "talking without difficulty" and exhibiting "even and unlabored" respirations, she advised Singh to "continue taking [his] inhaler," another provider also advised Singh to continue using his inhaler, she informed Singh that he had an upcoming appointment, and she attempted to examine Singh but discovered that he had been released from the disciplinary segregation unit ("DSU"). (Singh Ex. 2, at 60, 67.)

Dr. Shelton also responded to Singh's grievances and noted that Singh's provider increased his dosage of Gabapentin, Nurse Dieter informed a nurse from a different unit, defendant Gruenwald ("Nurse Gruenwald"), about Singh's complaints after she discovered that he had been released from the DSU, Singh "did not sign up to be seen in sick call for any on-going problems when [he was] released from DSU," and Singh did not exhibit breathing issues during Dr. Norton's examination on August 31, 2016. (Singh Ex. 2, at 63, 69.)

In January 2017, Nurse DaFoe denied Singh's second-level grievance appeals.[10] (Singh Ex. 2, at 65, 71.)

///

///

_____

[10] The grievances related to the August 2016 sick call form the basis of Singh's seventh claim in Case No. 2:16-cv-01957-SB, which he refers to as a claim for "[d]enial of medical care for sleep difficulty, breathing difficulty, bloody nose, back pain, and headache." (Singh Decl. at 27) (bold omitted).

####    8.    Singh's December 2016 Health Service Request

On December 6, 2016, Singh submitted a health service request because he was experiencing a sore throat, difficulty breathing, joint pain, dizziness, headaches, numbness, and tingling. (Singh Decl. ¶ 248; Singh Ex. 2, at 72.) A staff member responded noting that Singh should engage in self-care for his pain and alert security about "environmental concerns." (Singh Ex. 5, at 15.)

As a result, Singh filed a grievance on December 12, 2016, wherein he stated that the medical staff was aware of his ongoing health complications and pending lawsuits and showing their deliberate indifference to his serious medical needs, and complained that the staff member who responded failed to sign or date their response to his health service request. (Singh Ex. 2, at 72.)

Nurse Conley responded to Singh's grievance, apologized that the response "was not signed and dated as this would have been the appropriate thing to have done," and explained that this omission amounted to a "teaching moment" and was not a terminable offense. (Singh Ex. 2, at 73.) Singh, however, emphasized that the responder failed to address his "health and safety concerns while directing [him] to 'security' . . . [for his] environmental concerns." (Singh Ex. 2, at 74.)

On February 27, 2017, an ODOC medical director, defendant Christopher DiGiulio, M.D. ("Dr. DiGiulio"), reviewed Singh's grievance. (Singh Ex. 2, at 75.) Dr. DiGiulio noted that he agreed that the health services response should have been signed, he did not know who responded to Singh's health service request, Singh "may always send another" health service request if he finds the initial response to be inadequate, Singh presented for sick call on January 17, 2017, retaliation is "not tolerated," this was a "learning opportunity," and Singh was

"presently scheduled for future appointments with Dr. Norton and Dr. Dewsnup." (Singh Ex. 2, at 75.)

On March 31, 2017, Nurse DaFoe denied Singh's second-level grievance appeal, noting that the health services staff was "reminded to . . . sign and date responses to patient communications," the unknown staff member gave Singh "a medical recommendation" and thus did not deny "access to care," Singh continued to have access to health services, and Singh had been evaluated by a nurse or physician ten times since the beginning of the year.[11] (Singh Ex. 2, at 77.)

### 9.    Mold in the Handicap Shower

On February 15, 2017, Singh sent a kite to Nichols asking him to inspect mold in the handicap shower. (Singh Ex. 1, at 27.) Nichols informed Singh that the Physical Plant crew was "not a janitorial shop" and did not have a "cleaning crew," and that Singh needed to work with his housing unit officer, who could provide the cleaning supplies necessary to "clean and sanitize" the area. (Singh Ex. 1, at 27.)

On March 9, 2017, after receiving more complaints about the handicap showers, a housing unit staff member placed work orders for the Physical Plant crew to "clean, remove and seal the mold affected areas around the [tiles], holes and the handrails inside the handicap showers." (Singh Decl. ¶ 259.) Four days later, Singh filed a grievance against Nichols for failing to "remedy the unsanitary conditions of the mold handicap showers[.]" (Singh Decl. ¶ 260.) That same day, Singh also filed a grievance against TRCI's superintendent, defendant Brigitte Amsberry ("Amsberry"), based on the mold on the handrail in the handicap shower and

---

[11] The grievance related to the December 2016 health service request forms the basis of Singh's eighth claim in Case No. 2:16-cv-01957-SB, which he refers to as a claim for "[d]enial of medical care for sore throat, difficult breathing, joint pain, dizziness, migraine headaches and numbness/tingling." (Singh Decl. at 28) (bold omitted).

her refusal to discuss matters related to Singh's ongoing litigation. (Singh Ex. 2, at 89; Singh Decl. ¶ 260.)

A prison captain, defendant Lytle ("Captain Lytle"), responded to Singh's grievance against Nichols and explained that the Physical Plant crew addressed Singh's issues on March 9, 2017, the handrails in the shower no longer showed "indications of not being properly cleaned," and prison staff had "been advised to address any [inmate with a job assignment who] is not completing their cleaning require[ments] and [to] hold them accountable." (Singh Ex. 2, at 80.) Amsberry's executive assistant also responded to Singh's grievance against Amsberry, noting that the prison staff had been directed to follow up on Singh's complaints and to let Amsberry know if Singh's concerns had "been resolved." (Singh Ex. 2, at 92.)

On June 12 and July 24, 2017, Nooth reviewed Singh's case and denied Singh's second-level grievance appeals regarding mold in the showers.[12] (Singh Ex. 2, at 82, 84, 97; Singh Decl. ¶¶ 265, 280.)

### 10.    Dr. DiGiulio's Examination

On April 25, 2017, Singh visited Dr. DiGiulio complaining about symptoms Singh attributed to mold exposure. (Singh Decl. ¶ 282.) Dr. DiGiulio ordered blood work and peak flow tests. (Singh Decl. ¶¶ 283-88; Singh Ex. 4, at 90.) Singh's peak flow tests were below the normal range and Singh's blood work showed that he was "fighting an infection." (Singh Decl. ¶¶ 283-88.)

On May 1, 2017, Singh filed a grievance against Dr. DiGiulio based on "his misconduct towards [Singh] during [the] April 25, 2017 office visit." (Singh Decl. ¶ 287.) Two nurses, Nurse

---

[12] These grievances against Nichols and Amsberry forms the bases for Singh's ninth and tenth claims in Case No. 2:16-cv-01957-SB, which Singh refers to as claims for "[u]nsafe conditions of confinement" due to "mold in [the] handicap showers." (Singh Decl. at 29, 32) (bold omitted).

Conley and defendant Johnston ("Nurse Johnston"), responded to Singh's grievance, noting that

Dr. DiGiulio examined Singh and reviewed Singh's healthcare records, labs, and x-rays,

Dr. DiGiulio found "no clinical evidence of health issues related to black mold exposure,"

Dr. DiGiulio was "appropriately qualified and licensed to evaluate [Singh's] health," and "[n]o

clinical evidence has been found to support the need for a consultation with a 'qualified mold

specialist.'" (Singh Decl. ¶ 290; Singh Ex. 2, at 101.)

In a letter dated July 10, 2017, Dr. DiGiulio reiterated that there was "no clinical

evidence that [Singh has] a health condition related to black mold exposure," referral to a

specialist for further testing and treatment was not "medically indicated," and Dr. Norton

continued to follow and prescribe medication to treat Singh's "asthma diagnosis." (Singh Ex. 2,

at 104.)

On August 12, 2017, ODOC's interim health services administrator, defendant Sharon

Beck ("Beck"), denied Singh's second-level grievance appeal regarding Dr. DiGiulio.[13] (Singh

Ex. 2, at 106.)

C.      Case No. 2:17-cv-00829-SB

        1.      Singh's Fractured Fifth Metacarpal

On May 28, 2013, Singh visited Nurse Dieter and reported that he was "getting on [his]

bunk yesterday [and] bent [his] finger back." (Singh Ex. 4, at 23; Singh Decl. ¶ 298.) Nurse

Dieter's examination revealed that the fifth finger on Singh's right hand was bruised, swollen,

and without deformities, and Singh was "[a]ble to move [and] bend [the] finger [with some]

---

[13] This grievance forms the basis of Singh's eleventh and final claim in Case No. 2:16-cv-01957-SB, which he refers to as a claim for "[d]enial of medical care for mold exposure." (Singh Decl. at 33) (bold omitted).

discomfort." (Singh Ex. 4, at 23.) Nurse Dieter elected to "[b]uddy tape" Singh's fingers. (Singh Ex. 4, at 23.)

On June 21, 2013, Singh visited Nurse Smith complaining about his swollen finger, which he was "able to move," and requesting an x-ray. (Singh Decl. ¶ 299; Singh Ex. 4, at 26.) Nurse Smith consulted with Nurse Greunwald, who ordered an x-ray of Singh's finger. (Singh Decl. ¶ 299.) Singh's x-ray revealed a fractured finger: "Three views of the fifth finger of the right hand demonstrate a comminuted fracture of the proximal phalanx. There is good alignment. Some callus is present dorsally and on the ulnar side. The joint spaces are unremarkable and no other significant findings are seen." (Singh Ex. 4, at 173.) Based on his review of Singh's x-ray and examination of Singh's finger, Dr. Dewsnup concluded that Singh needed to be "splinted appropriately" and return for an x-ray in a month. (Singh Decl. ¶ 300.)

Singh returned to the medical department the next month complaining of pain in his finger and a nurse noted that Singh was "[w]earing a [left] handed finger split on [his right fifth] finger." (Singh Ex. 4, at 29.) The nurse therefore applied a "[s]traight finger splint" instead. (Singh Ex. 4, at 29.)

Singh continued to complain about finger pain and swelling and TRCI's medical staff responded by ordering x-rays of Singh's finger, providing ice and anti-inflammatories, examining Singh several times, applying a new splint to Singh's finger (although Singh disagreed with one nurse's decision to put him back in a splint that "had the overlap bar going from outside to inside instead [of] from inside to outside"), and referring Singh for a consultation with an orthopedic surgeon, James Karmy, M.D. ("Dr. Karmy"). (Singh Decl. ¶¶ 303-23; Singh Ex. 4, at 34.)

///

Singh's July 2013 x-ray revealed that the fracture of his "right small finger [was] again appreciated and unchanged in position," there was "further healing, but the fracture [was] not solid radiographically as yet," and Singh's finger was "in the mid stages of healing." (DiGiulio Decl. ¶ 40.) Singh's August 2013 x-ray revealed "a fracture of the fifth proximal phalanx," good alignment, that "the fracture lucency persist[ed] and there [was] little callus obvious," and that some of the "fracture lucencies [were] a bit less apparent suggesting some interval healing." (DiGiulio Decl. ¶ 41.)

Singh's September 2013 x-ray revealed that the "fracture of the fifth proximal phalanx [was] again seen," the "fracture lucency [was] less apparent suggesting some interval healing," and there "continue[d] to be soft tissue swelling." (DiGiulio Decl. ¶ 42.) Singh's November 2013 x-ray revealed "persistent lucency" and that "the [fifth] proximal phalanx appear[ed] to have healed," there was "soft tissue swelling," and the "healing ha[d] resulted with a small bony projection off the radial aspect of the head of the [fifth] proximal phalanx." (DiGiulio Decl. ¶ 43.)

Dr. Karmy reviewed the series of x-rays of Singh's finger. (Singh Ex. 4, at 178.) According to Dr. Karmy, Singh's series of x-rays revealed "healing of a comminuted fracture in good position and alignment and exostosis on the radial side of the joint at the distal end of the proximal phalanx." (Singh Ex. 4, at 178.) Dr. Karmy did not "suspect" that the exostosis on Singh's little finger was in "a position to inhibit [Singh's] motion very much," but noted that "if it [was] painful because of its prominence, it could be treated with surgical excision." (Singh Ex. 4, at 178.)

In December 2013, about two weeks after Dr. Karmy issued his opinion, Singh visited Nurse Gruenwald because his finger looked disfigured, still hurt, and was difficult to bend.

(Singh Decl. ¶ 300.) Nurse Greunwald noted that her examination revealed no "dysfunction of the hand" and that no further treatment was "indicated." (Singh Ex. 4, at 178.)

A little over a year later, Singh reported "excruciating" finger pain. (Singh Decl. ¶ 324.) Dr. Norton and the medical staff examined Singh and ordered another x-ray of his finger, which revealed "complete healing of the proximal phalanx fracture," unremarkable "interphalangeal joints," and a "persistent unchanged bony exostosis." (Singh Ex. 4, at 67-69; DiGiulio Decl. ¶ 45.)

In late April 2015, Singh filed a grievance against Dr. Norton based on his "failure to provide medical treatment for [his] ongoing pain related to [his] injured finger." (Singh Decl. ¶ 327.) During the grievance process, Dr. Norton referred Singh's case to the Therapeutic Level of Care ("TLC") committee to "ask for a referral to an orthopedist" because Singh wanted to have his exostosis excised given Dr. Karmy's opinion such a condition could be treated with surgical excision. (Singh Ex. 2, at 111; Singh Decl. ¶ 334.) The TLC committee determined that surgical excision of Singh's exostosis was "not medically necessary" and "recommended conservative care and re-evaluation[.]" (Singh Ex. 2, at 111.) Dr. Shelton also advised Singh that he "always had the choice to self-pay" for the surgery. (Singh Ex. 2, at 111.) Dr. Norton also advised Singh that he had reviewed his imaging and "agree[d]" with the TLC committee's decision. (Singh Ex. 4, at 181.)

On July 23, 2015, Nurse DaFoe denied Singh's second-level grievance appeal related to the treatment of his finger.[14] (Singh Ex. 2, at 113.)

///

---

[14] Singh's complaints about the TRCI medical staff's treatment of his finger and exostosis form the basis of his first claim for relief in Case No. 2:17-cv-00829-SB, which Singh refers to as a claim for cruel and unusual punishment and medical deliberate indifference. (Singh Decl. at 36-40.)

2.      **Singh's Skin Rash**

On June 1, 2015, Singh submitted a health service request to a medical services manager, defendant Whelan ("Whelan"), based on, among other things, a skin rash that he attributed to "exposure to [t]oxic mold, [d]ust and other conditions." (Singh Ex. 5, at 9; Singh Decl. ¶ 335) (bold omitted). Nurse Gruenwald provided Singh with an allergy medication and an inhaler and instructed Singh to purchase hydrocortisone cream to treat his rash. (Singh Ex. 4, at 70; Singh Decl. ¶ 338; *see also* Singh Ex. 5, at 9, reminding Singh that he had not ordered hydrocortisone cream).

On June 23, 2015, Singh filed a grievance against Nurse Gruenwald based on her "failure to provide medical care regarding his rash which led to permanent scarring." (Singh Decl. ¶ 339.) Nurse Johnston responded to Singh's grievance, noting that Nurse Greunwald prescribed oral medication and nasal spray to treat Singh's allergy symptoms and advised Singh to purchase hydrocortisone cream to treat his skin rash, all of which, according to Nurse Johnston, was "the same plan of care that would be offered to all individuals with these symptoms." (Singh Ex. 2, at 117.)

On December 7, 2015, after Dr. Shelton reviewed the treatment of Singh's rash and found that Singh received appropriate medical care, Nurse DaFoe denied Singh's second-level grievance appeal, noting that it "appear[ed] that [Singh was] treated fairly" and Nurse DaFoe did "not find any retaliation in regards to the care [Singh] received" for his rash.[15] (Singh Ex. 2, at 119, 121.)

///

---

[15] Singh's grievance and declaration also refer to "retaliation," but Singh characterizes his second claim for relief in Case No. 2:17-cv-00829-SB as a claim for "[o]ngoing inadequate" medical care and "denial of medical care for exposure to mold." (Singh Decl. at 40-41) (bold omitted).

### 3.   Singh's Mini-Dorm

On March 24, 2015, ODOC assigned Singh to "TRCI's Unit 11[.]" (Decl. of David Pedro in Supp. of Defs.' Mot. for Summ. J. ("Pedro Decl.") ¶ 4, ECF No. 176.) This unit is a "honor housing unit for inmates who have clear conduct and are programming," and Singh's bunk was one of twelve beds "located in a classroom on Unit 11 that was converted into a 'mini' dorm." (Pedro Decl. ¶ 4.)

In April 2015, Singh contacted the operations captain, defendant David Pedro ("Pedro"), and complained that the door adjacent to his sleeping area was "nois[y] 24 hours a day" as a result of staff entering or leaving the mini-dorm and the mini-dorm's windows resulted in "constant illumination." (Singh Decl. ¶¶ 338-39; Pedro Decl. ¶¶ 1, 5.) Pedro "offered to move . . . Singh from the mini-dorm to another housing assignment on the same housing unit but [Singh] stated he wanted to remain in the mini-dorm." (Pedro Decl. ¶ 5.) Pedro therefore asked Singh to rescind his complaints, and Singh submitted a kite stating that he "[r]escind[ed] [his] earlier statement regarding [being] under constant illumination 24 hours a day." (Pedro Decl. ¶ 5; Singh Ex. 1, at 7.)

In early June 2015, Singh contacted Captain Lytle about any planned adjustments to the mini-dorm's lighting and Captain Lytle informed Singh that he "check[ed] with both security and [the] physical plant [crew] and there [are] 'no' adjustments being considered." (Singh Ex. 1, at 8.)

On June 8, 2015, Pedro, who heard that "Singh was continuing to complain about the lighting on the mini-dorm to other inmates," decided to move Singh "back to a celled housing on Unit 11," because security staff has the discretion to move AICs from dormitory housing if they are "impos[ing] additional burdens on staff" and Pedro believed that Singh's complaints about the lighting was "creating a disruption of the normal, safe operation of the unit." (Pedro Decl. ¶¶

6, 8-9.) Pedro also explained to Singh that the lighting in the mini-dorm, an "open bay setting," is "required for safety and security reasons and there will be noise when staff or inmates enter and leave the mini-dorm." (Pedro Decl. ¶¶ 8-9.) According to Pedro, the mini-dorms must have "enough illumination" so security staff can carry out their duties, such as observing AICs' conduct "at a moment's notice" and conducting inmate counts, in "a safe manner." (Pedro Decl. ¶ 10.)

Four days later, Pedro discovered that moving Singh from the mini-dorm to celled housing in the honor housing unit resulted in Singh losing his "orderly program assignment." (Pedro Decl. ¶ 12.) Pedro therefore asked "the [Work] Assignment Office to double-fill an orderly position so that [Singh] could remain unharmed by changing his housing assignment[.]" (Pedro Decl. ¶ 12.) Singh did not receive credit for the few days of work he missed. (Singh Decl. ¶ 359.)

On June 23, 2015, Singh filed a grievance against Pedro "regarding his misconduct." (Singh Decl. ¶ 354.) During and before the grievance appeal process, Singh accused Pedro of "threatening" to move Singh out of the mini-dorm if he did not rescind his complaints about the lighting. (Singh Decl. ¶¶ 355, 363.) Pedro denied that he ever coerced, threatened, or forced Singh to rescind his complaint about the lighting, and explained that Singh wanted to stay in the mini-room and talked Pedro into remaining there and that Pedro asked Singh to submit the kite rescinding his complaint because he wanted to protect himself given Singh's "litigious nature." (Singh Ex. 1, at 33.)

On October 19, 2015, after Singh complained to an ODOC superintendent, defendant John Myrick ("Myrick"), and ODOC's director, defendant Colette Peters ("Peters"), Franke denied Singh's second-level grievance appeal, noting that Pedro "directed staff to ensure that

[Singh was] assigned to a Unit Orderly assignment."[16] (Singh Decl. ¶¶ 363-370; Singh Ex. 2, at 129.)

## II.    DEFENDANTS' EXPERT REPORT

Defendants retained Douglas Hancock ("Hancock"), an engineer, Certified Industrial Hygienist, and Certified Safety Professional, as an expert to investigate Singh's mold-related claims. (Decl. of Douglas Hancock in Supp. of Defs.' Mot. Summ. J. ("Hancock Decl.") ¶¶ 1-2, ECF No. 177.) Hancock, who works for PBS Engineering and Environmental Inc. ("PBS"), has a background in chemistry and toxicology, twenty-eight years of "experience dealing with the workplace environment including assessment and control of hazardous waste sites and working around radiological hazards," and "experience[] in air-quality investigations; water-quality studies; environmental soil and groundwater investigations and remediation; and asbestos and lead management." (Hancock Decl. Attach. 1, at 5.) Hancock prepared a report after reviewing Singh's "medical records, repair/work orders, photographs, and other [relevant] information[.]" (Hancock Decl. ¶ 1.)

Hancock's report focused primarily on Singh's potential exposure to fungal materials during (1) "the cleaning of a combination toilet-sink fixture in . . . Singh's cell," (2) "the cleaning of a kitchen walk-in freezer," and (3) "the demolition and repair of a shower area." (Hancock Decl. Attach. 1, at 3.) Hancock's report noted that the suspected fungal growth in Singh's cell was "likely [four or five] square inches which is considered *de minimis* in the context of fungal abatement"; Singh did not perform any of the "cleaning of the walk-in freezer [or] the demolition and repair of the shower area"; and it was "PBS' understanding that [the

---

[16] The events underlying Singh's grievance against Pedro form the basis of his third and final remaining claim in Case No. 2:17-cv-00829-SB, and Singh characterizes this claim as an Eighth Amendment claim based on the excessive lighting and noise in the mini-dorm. (Singh Decl. at 41.)

cleaning of the walk-in freezer and demolition and repair of the shower area] was performed by trained workers using methodologies that were consistent with OSHA guidelines." (Hancock Decl. Attach. 1, at 3.)

Hancock's report concluded that there was no correlation between Singh's diagnoses and the dates of alleged mold exposure, the conditions Singh encountered did not exceed what would normally be encountered during routine maintenance of a personal residence, and personal protective equipment ("PPE") was not necessary:

> PBS reviewed over one thousand records relating to medical checkups, dental work, surgeries, and psychological exams for [Singh]. . . . PBS attempted to correlate the dates of the medical records with the dates associated with [the] three events addressed above. In performing an industrial hygiene assessment of a reported health concern, we tried to determine if onset of reported symptoms coincided with known change in the environment. PBS observed no correlation between actual diagnosed illness in [Singh] with the dates of the three events.

> In reviewing the details associated with the three above referenced events, PBS observed no documentation supporting a presumption that fungal materials were present or that 'toxic' fungal materials were present. The information indicating that fungal conditions were present at all was anecdotal.

> . . . .

> PBS reviewed photographs representing typical conditions associated with normal shower conditions [at the TRCI]. In the photographs, small areas of black discoloration are visible in corners and on grout-lines separating the ceramic tiles. These conditions would be considered unexceptional in a residential setting and the cleaning of these conditions would not warrant the use of unusual precautions or special [PPE] unless the cleaners being used would warrant it.

> Based upon PBS' review of the available medical records, maintenance records, and photographs, it is PBS' opinion that fungal exposures present in the institution and fungal exposures related to the routine cleaning of inmate cells and shower rooms would not present a sufficient fungal hazard concern to warrant special or unusual precautions such as the use of PPE or special cleaning materials and methods. PBS observed no indication that the fungal conditions encountered by [Singh] exceeded what would normally be encountered during the routine maintenance of a normal residence.

(Hancock Decl. Attach. 1, at 3-4.)

## LEGAL STANDARDS

Summary judgment is proper if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). At the summary judgment stage, the court views the facts in the light most favorable to the non-moving party, and draws all reasonable inferences in favor of that party. *Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005). The court does not assess the credibility of witnesses, weigh evidence, or determine the truth of matters in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

## DISCUSSION

### I.    COURT-APPOINTED EXPERTS

Before addressing Defendants' motions for summary judgment, the Court evaluates Singh's renewed motions for appointment of an expert to investigate his mold-related claims. (Pl.'s Renewed Mot. for Appointment of an Expert ("Pl.'s Mot. for Appointment") at 1.) Singh argues that the Court should appoint a "neutral expert" to review the record because Hancock's "one-sided opinion" relies on "misleading and manufactured facts" and was "prepared with [a] jaundice eye to undermine [his] meritorious claims." (Pl.'s Mot. for Appointment at 2) (emphasis omitted).

#### A.    Applicable Law

Federal Rule of Evidence 706 "permits a court to appoint a neutral expert to assist the court to understand complex, technical, or esoteric subject matter." *Woodroffe v. Oregon*, No. 2:12-cv-00124-SI, 2014 WL 1383400, at *5 (D. Or. April 8, 2014) (citing *Walker v. Am. Home*

*Shield Long Term Disability Plan*, 180 F.3d 1065, 1071 (9th Cir. 1999)). However, "court appointment of experts is appropriate only in 'rare circumstances' and should be reserved for 'exceptional cases.'" *Herrington v. Elliot-Blakeslee*, No. 2:13-cv-0948-AC, 2016 WL 1420976, at *4 (D. Or. Apr. 11, 2016) (citation omitted). Courts do not typically appoint experts when the record has been adequately developed and the evidence or subject matter is not difficult to understand. *See id.* (noting that "court-appointed experts typically are used in complex litigation where the record is not clearly developed by the parties," and denying a motion for a court-appointed expert because the facts were "not particularly complex," the "subject matter or evidence [was] not difficult to understand," the medical records were "clearly developed," and an expert witness, who was "well-suited for [the] task," addressed the health risk question at issue).

Ultimately, a "court's decision whether to appoint an expert is discretionary," but it is well settled that "there is no statutory authorization for a court-appointed investigator for civil litigants proceeding in forma pauperis," *Snow v. Mar*, 785 F. App'x 465, 466 (9th Cir. 2019) (citing *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051 n.7 (9th Cir. 2002)), and courts may not appoint an expert to "represent the interests of one party." *DeJesus v. Godinez*, 720 F. App'x 766, 772 (7th Cir. 2017) (citing *Kennedy v. Huibregtse*, 831 F.3d 441, 443 (7th Cir. 2016)); *see also Woodroffe*, 2014 WL 1383400, at *5 (explaining that "[a] court may not . . . appoint an expert on behalf of an indigent civil party" (citing *Tedder v. Odel*, 890 F.2d 210, 211 (9th Cir. 1989)).

**B.    Analysis**

The Court concludes that no rare or exceptional circumstances exist to warrant the appointment of an expert witness under Fᴇᴅ. R. Eᴠɪᴅ. 706, and therefore denies Singh's renewed motions.

Given his work as an engineer qualified as a Certified Industrial Hygienist and Certified Safety Professional, background in chemistry and toxicology, and experience assessing and containing hazardous material, Hancock—who has "no previous attachments or connections with the [ODOC]" (Defs.' Mot. for Summ. J. ("Defs.' Mot.") at 29)[17]—is well qualified to opine on the severity of the mold at Singh's prison, whether PPE was necessary, and whether there appeared to be a correlation between Singh's medical diagnoses and the dates of alleged mold exposure. An ODOC medical director, Dr. DiGiulio, who reviewed Singh's records and is "familiar with the care [Singh] has received since his incarceration," also provided an opinion based on Singh's test results ruling out chronic disease process related to mold exposure. (*See* DiGiulio Decl. ¶¶ 1, 5, 74-75, stating that "Singh has received multiple tests that rule out any chronic disease process related to mold exposure"; *see also* Pl.'s Am. Resp. to Defs.' Mot. Summ. J. ("Pl.'s Resp.") at 69, recognizing "the Court's duty to consider [Dr.] DiGiulio's testimony," but arguing that it should "not give weight to his lay opinions concerning [Singh's] mental health"). In light of Hancock's and Dr. DiGiulio's opinions and expertise in the relevant areas, the Court concludes that another expert opinion is not necessary for the Court to understand the relevant subject matter. *Cf. Herrington*, 2016 WL 1420976, at *4 (denying a motion for a court-appointed expert and finding that an ODOC physician provided a sufficient expert opinion).

Although Singh did not explain as much in his renewed motion for a court-appointed expert (*see* Pl.'s Mot. for Appointment at 1-2), Singh's summary judgment response suggests

---

[17] It is noteworthy that after retaining Hancock, counsel for Defendants "pledged to [Singh] that we would produce to him a complete and unredacted copy of Mr. Hancock's findings – regardless of whether Mr. Hancock's findings turned out to be favorable or unfavorable to the Defendants " and "[a]s pledged, Defendants did disclose Mr. Hancock's unredacted findings to Plaintiff on August 16, 2018." (Defs.' Resp. to Pl.'s Renewed Mot. for Order Requiring *Martinez* Report and for Neutral Expert, at 2.)

that he takes issue with Hancock's opinion because it does not reflect that Hancock "ever collected and tested [any mold samples] to determine the presence of [any] toxicity," or specifically identified the medical records, work orders, and photographs he reviewed.[18] (*See* Pl.'s Resp. at 70-71, disputing whether certain findings can be "factually true" without testing). On the contrary, Hancock's report indicates that he reviewed Singh's medical records and compared them to the dates of alleged mold exposure and reviewed work and maintenance orders related to the cleaning of the walk-in freezer and demolition and repair of the shower area, as well as "photographs representing typical conditions associated with normal shower conditions [at TRCI]." (Hancock Decl. Attach. 1, at 1, 3-4.) As to Hancock's alleged failure to test mold samples, Hancock concluded, based on his expertise, that the medical records, work and maintenance orders, and photographs were sufficient to demonstrate that the conditions Singh encountered did not "exceed[] what would normally be encountered during the routine maintenance of a normal residence." (Hancock Decl. Attach. 1, at 4; *see also* Hancock Decl. Attach. 1, at 2, explaining that there "has not been a conclusive study that shows any adverse toxic health affect associated with normal exposures to airborne fungal materials related to routine cleaning of small areas of fungal growth").

The Court finds that Hancock and Dr. DiGiulio have provided opinions that are sufficient to assist the Court in understanding Singh's medical history, the objective medical evidence, and the severity and potential impact of Singh's mold exposure. Accordingly, the Court exercises its discretion to deny Singh's motions for a court-appointed expert.

---

[18] Singh also appears to endorse some of Hancock's opinions, such as his opinion that "individuals with asthma can have an asthmatic condition triggered by exposure to fungal materials" and that exposure to fungal materials can produced "irritant effects" like "itching skin and itching eyes and sinuses." (Pl.'s Resp. at 71.)

PAGE 28 – OPINION AND ORDER

## II.    DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants move for summary judgment on all of Singh's remaining claims in these

consolidated cases. On this record, no reasonable juror could conclude that any of the named

defendants (1) were deliberately indifferent to Singh's serious medical needs, (2) were

deliberately indifferent to Singh's conditions of confinement, or (3) retaliated against Singh for

filing prison grievances. Accordingly, the Court grants Defendants' motions for summary

judgment.

### A.    Deliberate Indifference to Serious Medical Needs

#### 1.    Applicable Law

"Under 42 U.S.C. § 1983, to maintain an Eighth Amendment claim based on prison

medical treatment, an inmate must show 'deliberate indifference to serious medical needs.'" *Jett

v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104

(1976)). The Ninth Circuit's "test for deliberate indifference to [serious] medical need is two-

pronged[.]" *Wilhelm v. Rotman*, 680 F.3d 1113, 1122 (9th Cir. 2012) (citing *Jett*, 439 F.3d at

1096).

#### a.    Prong One—Serious Medical Need

First, the plaintiff must show "the existence of a serious medical need." *Colwell v.

Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014) (citing *Estelle*, 429 U.S. at 104). A serious

medical "need exists if failure to treat the injury or condition 'could result in further significant

injury' or cause 'the unnecessary and wanton infliction of pain.'" *Id.* (quoting *Jett*, 439 F.3d at

1096). Other indicators of a serious medical need include: "'[T]he existence of an injury that a

reasonable doctor or patient would find important and worthy of comment or treatment; the

presence of a medical condition that significantly affects an individual's daily activities; or the

existence of chronic and substantial pain.'" *Id.* (quoting *McGuckin v. Smith*, 974 F.2d 1050,

1059-60 (9th Cir. 1991), *overruled on other grounds by WMX Technologies, Inc. v. Miller*, 104

F.3d 1133 (9th Cir. 1997)).

### b.    Prong Two—Deliberate Indifference

"Second, the plaintiff must show that the defendant's response to the need was

deliberately indifferent." *Jett*, 439 F.3d at 1096 (citing *McGuckin*, 974 F.2d at 1060). "A prison

official is deliberately indifferent under the subjective element of the test only if the official

'knows of and disregards an excessive risk to inmate health and safety.'" *Colwell*, 763 F.3d at

1066 (quoting *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004)). "This 'subjective

approach' focuses only 'on what a defendant's mental attitude actually was." *Toguchi*, 391 F.3d

at 1057 (quoting *Farmer v. Brennan*, 511 U.S. 825, 839 (1994)). To establish deliberate

difference under this approach, a plaintiff must do more than show (1) a difference of medical

opinion as to the need to pursue one course of treatment over another; (2) mere negligence in

diagnosing or treating a medical condition; (3) medical malpractice; or (4) even gross

negligence. *See Toguchi*, 391 F.3d at 1057-60 (explaining that "[d]eliberate indifference is a high

legal standard," "'[m]ere negligence in diagnosing or treating a medical condition . . . does not

violate a prisoner's Eighth Amendment rights,'" "[a] showing of medical malpractice or

negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment,"

and "even gross negligence is insufficient to establish a constitutional violation") (citations

omitted); *Wilhelm*, 680 F.3d at 1122 (explaining that "'a plaintiff's showing of nothing more

than a difference of medical opinion as to the need to pursue one course of treatment over

another [is] insufficient, as a matter of law, to establish deliberate indifference'") (citation

omitted).

///

///

### 2.    Summary of Claims

Fifteen claims remain in these consolidated cases. Nine of Singh's remaining claims allege violations of the Eighth Amendment arising from allegedly deficient medical treatment, on a theory of deliberate indifference to Singh's serious medical needs:

1.    Singh's remaining claim in Case No. 2:14-cv-01477-SB, which is based on the grievance about Singh's initial exposure to mold in the tortilla room and the care Singh received thereafter;

2.    Claim One in Case No. 2:16-01957-SB, which is based on the grievance about Dr. Norton's treatment in July and August 2014;

3.    Claim Five in Case No. 2:16-01957-SB, which is based on the grievance about the March 2016 shower project;

4.    Claim Six in Case No. 2:16-01957-SB, which is based on the grievance about Singh's exposure to pepper spray;

5.    Claim Seven in Case No. 2:16-01957-SB, which is based on the grievance about Singh's August 2016 sick call;

6.    Claim Eight in Case No. 2:16-01957-SB, which is based on the grievance about Singh's December 2016 health service request;

7.    Claim Eleven in Case No. 2:16-01957-SB, which is based on the grievance about Dr. DiGiulio's examination;

8.    Claim One in Case No. 2:17-cv-00829-SB, which is based on the grievance about the treatment of Singh's fractured finger; and

9.    Claim Two in Case No. 2:17-cv-00829-SB, which is based on the grievance about the treatment of Singh's skin rash.

///

PAGE 31 – OPINION AND ORDER

3.    **Analysis**

The Court finds that no reasonable juror could conclude that any of the named defendants were deliberately indifferent to Singh's serious medical needs. *See Toguchi*, 391 F.3d at 1057-60 (explaining that negligence in diagnosing or treating a condition, medical malpractice, and even gross negligence are insufficient to establish an Eighth Amendment violation); *Wilhelm*, 680 F.3d at 1122 (explaining that "'a plaintiff's showing of nothing more than a difference of medical opinion as to the need to pursue one course of treatment over another [is] insufficient, as a matter of law, to establish deliberate indifference'") (citation omitted).

As to the remaining claim in Case No. 2:14-cv-01477-SB, the record reveals that Singh's medical providers concluded that Singh's respiratory symptoms were not related to his initial exposure to mold in the tortilla room.[19] Instead, Singh's providers believed that his symptoms were due to issues with allergies, recurrent URIs, a bacterial infection, GERD, and asthma. The record also reflects that Singh's providers were consistently responsive to Singh's complaints. To be sure, Singh's providers provided Singh with allergy medications, GERD medication, antibiotics, and inhalers; examined Singh numerous times; ordered x-rays of Singh's chest, which were negative and showed that Singh's lungs were clear and expanded; ordered blood work; ordered a throat culture, which was negative for infection; referred Singh to an infectious disease expert who diagnosed Singh with inflammatory bronchitis; and referred Singh to an ODOC medical director, who diagnosed Singh with asthma. Given this record, there is no

---

[19] Hancock's expert report and Dr. DiGiulio's opinion corroborate the providers' conclusions. Notably, Hancock concluded that the moldy conditions Singh encountered did not "exceed[] what would normally be encountered during the routine maintenance of a normal residence," and Dr. DiGiulio stated that "Singh has received multiple tests that rule out any chronic disease process related to mold exposure." (DiGiulio Decl. ¶¶ 1, 5, 74-75; Hancock Decl. Attach. 1, at 4; *see also* Hancock Decl. Attach. 1, at 2, explaining that there "has not been a conclusive study that shows any adverse toxic health affect associated with normal exposures to airborne fungal materials related to routing cleaning of small areas of fungal growth").

genuine issue of fact as to whether any of the named defendants were deliberately indifferent to Singh's medical needs.

As to Claim One in Case No. 2:16-01957-SB, it is clear that Singh disagreed with Dr. Norton's findings and treatment decisions in July and August 2014, because Singh believed that his symptoms were related to exposure to toxic black mold, while Drs. Norton and Shelton believed that Singh's symptoms should be treated with an inhaler and allergy medications. Singh's difference of opinion is insufficient, as a matter of law, to establish deliberate indifference.

As to Claim Five in Case No. 2:16-01957-SB, the record reveals that the prison staff reported that they followed OHSA standards and ODOC rules and procedures during the March 2016 shower project. The record also reveals that a physical plant coordinator confirmed that the shower area was "totally sealed with plastic and the predator air scrubber with [high-efficiency particulate air] filters [were] in place," prison officials interviewed the supervisor and AIC who performed the work, and the supervisor and AIC confirmed that "the area was totally sealed off with plastic sheeting," the "plastic was sealed behind them" whenever they entered or exited the work area, and the plastic "was sealed around the intake on the predator air filtering machine." (Singh Ex. 2, at 46, 48.) Given this evidence, no reasonable juror could conclude that Defendants were deliberately indifferent with respect to any serious medical needs resulting from the March 2016 shower project.

As to Claim Six in Case No. 2:16-01957-SB, the records show that Singh complained that he was exposed to pepper spray and did not receive treatment like other AICs with asthma. The record, however, reveals that sick call was available to Singh, Singh did not sign up for sick call during the days that followed, officials reviewed Singh's records and did not find a

documented report of respiratory symptoms on the day in question, and Singh had a rescue inhaler that he could have used to treat his breathing issues. Given this evidence, no reasonable juror could conclude that Defendants were deliberately indifferent to any serious medical needs arising out of Singh's secondary exposure to pepper spray.

As to Claim Seven in Case No. 2:16-01957-SB, the record reveals that Nurse Dieter assured Singh that she would examine him based on his recent complaints about sciatica in his left leg, back pain, need for an increased dosage of Gabapentin, difficulty breathing, irritated eyes, and headaches. When Nurse Dieter attempted to do so, she discovered that Singh had been released from the DSU. As a result, Nurse Dieter informed Nurse Gruenwald about Singh's complaints and Singh about his upcoming appointment and need to continue using his inhaler. Given this evidence, no reasonable juror could conclude that Defendants were deliberately indifferent to Singh's serious medical needs.

As to Claim Eight in Case No. 2:16-01957-SB, Singh submitted a health services request in December 2016 based on complaints of a sore throat, difficulty breathing, joint pain, dizziness, headaches, numbness, and tingling, and unknown staff member responded that Singh should engage in self-care for his pain and alert prison security about any environmental concerns. Thereafter, Singh complained about the lack of response to his health service request and the staff member's failure to sign the response. However, as Dr. DiGiulio explained, nothing prevented Singh from submitting another health service request if he believed the initial response was inadequate. The record also reveals that the medical staff treated Singh on ten occasions in early 2017 and that Nurse DaFaoe counseled staff members on the need to sign responses. Given this evidence, no reasonable juror could conclude that Defendants were deliberately indifferent to Singh's serious medical needs.

As to Claim Eleven Case No. 2:16-01957-SB, Dr. DiGiulio examined Singh on April 25, 2017, based on respiratory complaints that Singh attributed to mold exposure. Dr. DiGiulio reviewed Singh's records, labs, and x-rays, and ordered blood work and peak flow tests. Singh's peak flow tests were below the normal range and Singh's blood work showed that his white blood count was elevated, and he was fighting an infection. Dr. DiGiulio, however, did not believe that there was clinical evidence demonstrating that Singh's health issues were related to mold exposure. Although Singh disagreed with Dr. DiGiulio and filed a grievance based on that dispute alleging that Dr. DiGiulio is not a mold specialist, Singh's difference of opinion as to the proper diagnosis and course of treatment is insufficient, as a matter of law, to establish deliberate indifference. *See Wilhelm*, 680 F.3d at 1122 (so holding). Furthermore, even if Dr. DiGiulio was negligent in diagnosing and treating Singh's respiratory symptoms, negligence alone is not sufficient to establish an Eighth Amendment violation. *See Toguchi*, 391 F.3d at 1057 ("Mere negligence in diagnosing or treating a medical condition, without more, does not violate a prisoner's Eighth Amendment rights."). Thus, Defendants are entitled to summary judgment on this claim.

As to Claim One in Case No. 2:17-cv-00829-SB, Singh takes issue with the fact that Nurse Dieter initially buddy-taped his finger, the nursing staff at times applied a splint that overlapped from the outside instead of the inside, and he suffers from pain due to an exostosis. The record, however, reveals that Singh's medical providers responded to his complaints by ordering numerous x-rays; providing ice and anti-inflammatories; referring Singh to an orthopedic surgeon, who concluded that Singh's exostosis would not inhibit Singh's motion very much but could be treated with surgical excision if it was painful; referred Singh's request for a surgical excision to the TLC committee for review; and reviewed Singh's imaging to determine

whether they agreed with the TLC committee's decision to deny Singh's request for surgery. Dr. DiGiulio has also reviewed Singh's medical records. According to Dr. DiGiulio, Singh's "fracture is well-healed . . . and the persistent, unchanged bony exostosis . . . is a benign condition that occurs with the healing process of a fracture and is located in an area that does not cause discomfort," Singh "has full range of motion of the right hand with no observed impairment when he is animated and focused on other matters," and Singh's claim that "he is experiencing severe, debilitating pain . . . is not supported by the objective evidence." (DiGiulio Decl. ¶ 46.) Given this evidence, no reasonable juror could conclude that Defendants were deliberately indifferent to Singh's serious medical needs relating to his fractured finger.

As to Claim Two in Case No. 2:17-cv-00829-SB, the record reveals that Singh complained of a skin rash that caused scarring. Singh's providers concluded that Singh was suffering from allergies, provided Singh with allergy medications and an inhaler, and instructed Singh to purchase hydrocortisone cream. Singh seems to believe that this course of treatment was inappropriate and that his providers should have attributed his rash to exposure to toxic black mold. Singh's difference of opinion as to the proper diagnosis and course of treatment is insufficient, as a matter of law, to establish deliberate indifference. Even if Singh's providers were negligent in diagnosing and treating his skin rash, mere negligence is not sufficient to establish an Eighth Amendment violation. Accordingly, Defendants are entitled to summary judgment on this claim.

### 4.    Conclusion

"Deliberate indifference is a high legal standard. A showing of medical malpractice or negligence is insufficient to establish a constitutional deprivation under the Eighth Amendment." *Toguchi*, 391 F.3d at 1060. Even viewed in the light most favorable to Singh, the record fails to demonstrate that any of Singh's medical providers were deliberately indifferent to Singh's

PAGE 36 – OPINION AND ORDER

serious medical needs. Accordingly, the Court grants Defendants' motions for summary

judgment on Singh's Eighth Amendment medical claims.[20]

### B.    Deliberate Indifference to Conditions of Confinement

#### 1.    Applicable Law

"To prove an Eighth Amendment violation based on prison conditions, a prisoner must

satisfy a two-part test." *Grenning v. Miler-Stout*, 739 F.3d 1235, 1238 (9th Cir. 2014). The first,

"objective part of the test requires a showing that the defendants deprived the plaintiff of the

'minimal civilized measure of life's necessities.'" *Id.* (quoting *Hallett v. Morgan*, 296 F.3d 732,

744 (9th Cir. 2002)). For example, the Ninth Circuit has "held that continuous lighting can

satisfy the objective part of the test," and recognized that "'[a]dequate lighting is one of the

fundamental attributes of 'adequate shelter' required by the Eighth Amendment . . . [and] there

[is typically] no legitimate penological justification for requiring inmates to suffer physical and

psychological harm by living in constant illumination.'" *Id.* (quoting *Keenan v. Hall*, 83 F.3d

1083, 1090 (9th Cir. 1996), *opinion amended on denial of reh'g*, 135 F.3d 1318 (9th Cir. 1998));

*cf. Chappell v. Mandeville*, 706 F.3d 1052, 1058 (9th Cir. 2013) ("*Keenan* did not clearly

establish that constant illumination violates the Eighth Amendment when done for a legitimate

penological purpose. *Keenan* noted that no legitimate penological justification had been offered

in that case. . . . In contrast [to *Keenan*], the record here reflects a clear penological purpose.

Prison officials suspected that [the plaintiff] had secreted contraband in his body and kept the

---

[20] Singh also references complaints about treatment of his knee and hip pain.
Dr. DiGiulio suggests that the x-rays of Singh's left leg and hip were largely unremarkable and
showed only "a slight narrowing [of] the lumbosacral disc that [was] unchanged [over the last
four years]," "no evidence of fracture, dislocation effusion or degenerative changes," and
"normal articulation with no evidence of acute or significant chronic abnormality." (DiGiulio
Decl. ¶ 48.)

lights on so that they could monitor [the plaintiff twenty-four] hours a day to prevent him from disposing of the contraband.").

The second "subjective part [of the two-part test] requires a showing that the defendants 'acted with deliberate indifference[.]'" *Grenning*, 739 F.3d at 1238 (quoting *Hallett*, 296 F.3d at 744). In other words, the plaintiff must "show[] that the defendant knew of an excessive risk to inmate health or safety that the defendant deliberately ignored." *Id.* at 1239 (citing *Johnson v. Lewis*, 217 F.3d 726, 734 (9th Cir. 2000)). A plaintiff can meet this burden by demonstrating that "the risk posed by the deprivation [was] obvious," and "the prison officials had no 'reasonable' justification for the deprivation, in spite of that risk." *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) (quoting *Farmer*, 511 U.S. at 842-44). Prison officials, however, cannot be held "liable if they respond reasonably to the risk." *Grenning*, 739 F.3d at 1239 (citing *Thomas*, 611 F.3d at 1150).

### 2.    Summary of Claims

Seven of Singh's fifteen remaining claims assert that he was subjected to unconstitutional conditions of confinement:

1.    Claim Two in Case No. 2:16-01957-SB, which is based on the grievance about mold on Singh's cell wall and near Singh's toilet;

2.    Claim Three in Case No. 2:16-01957-SB, which is based on the grievance about the February 2015 shower project;

3.    Claim Four in Case No. 2:16-01957-SB, which is based on the grievance about mold in Singh's cell vent and sink;

4.    Claim Five in Case No. 2:16-01957-SB, which is based on the grievance about the March 2016 shower project;

5.      Claims Nine and Ten, in Case No. 2:16-01957-SB, which are based on the
         grievances about mold in the handicap shower; and

6.      Claim Three in Case No. 2:17-cv-00829-SB, which is based on the
         grievance about the noise and lighting in the mini-dorm.

         **3.      Analysis**

Even when viewed in the light most favorable to Singh, the record demonstrates that
Defendants reasonably responded to Singh's complaints about his conditions of confinement and
were not deliberately indifferent to any risks to Singh's health or safety.

As to Claim Two in Case No. 2:16-01957-SB, after Singh complained about mold on his
cell wall and near his sink, prison officials moved Singh from his cell, inspected Singh's cell,
and dispatched crews to clean any mold in Singh's cell and two other cells and to seal and caulk
any areas to prevent any growth of mold. Defendants' actions in response to the presence of a
small amount of mold do not rise to the level of deliberate of indifference, especially in light of
Hancock's opinion that the mold Singh encountered did not "exceed[] what would normally be
encountered during the routine maintenance of a normal residence," and Dr. DiGiulio's opinion
that "Singh has received multiple tests that rule out any chronic disease process related to mold
exposure." (DiGiulio Decl. ¶¶ 1, 5, 74-75; Hancock Decl. Attach. 1, at 4; *see also* Hancock Decl.
Attach. 1, at 2, "There has not been a conclusive study that shows any adverse toxic health affect
associated with normal exposures to airborne fungal materials related to routing cleaning of
small areas of fungal growth.").

As to Claim Three in Case No. 2:16-01957-SB, Singh complained about dust and smells
caused by the February 2015 shower project and inquired about adherence to safety standards.
Lancaster explained that he "sealed off the shower area with plastic to insulate any dust [from]
leaving the shower area," he "followed the OSHA standards [for] removing and containing the

PAGE 39 – OPINION AND ORDER

area," he "cut the grout in between the tiles" to let the floor dry, and he worked on the project and "did not see any mold or black mold that was in the shower area or under the tiles." (Singh Ex. 2, at 33.) Given this evidence and the evidence described above, no reasonable juror could conclude that Defendants were deliberately indifferent to the risks posed to Singh by this shower project.

As to Claim Four in Case No. 2:16-01957-SB, Singh complained about a noxious smell coming from his cell vents and sink. Nichols responded that Singh needed to submit a work order, he did not know why there would such a smell since "OSHA did not report finding any mold," the smell from the sink could be due to type of plumbing system at TRCI, and TRCI's HVAC "staff checked the air handling system and did not find anything out of the ordinary[, nor did the staff] find any sign of mildew or mold anywhere." (Singh Decl. ¶ 193; Singh Ex. 2, at 38.) No reasonable juror could conclude that this level of responsiveness amounted to deliberate indifference.

As to Claim Five in Case No. 2:16-01957-SB, Singh filed a grievance about the March 2016 shower project. As was the case with the February 2015 shower project, prison officials confirmed that they followed all safety protocols during the March 2016 shower project and that the unit shower area was "totally sealed with plastic and the predator air scrubber with [high-efficiency particulate air] filters [were] in place." (Singh Ex. 2, at 46.) They also interviewed the crew supervisor and AIC who performed the work. The supervisor and AIC "confirmed the area was totally sealed off with plastic sheeting" and explained that they ensured that the "plastic was sealed behind them" whenever they entered or exited the work area, the plastic "was sealed around the intake on the predator air filtering machine," and none of the "work was completed during meal periods." (Singh Ex. 2, at 48.) In light of this evidence, no reasonable juror could

conclude that Defendants were deliberately indifferent to the risks posed to Singh by the March 2016 shower project.

As to Claims Nine and Ten, in Case No. 2:16-01957-SB, Singh complained about the presence of mold in the handicap shower, in particular mold on or near the handrail. According to Hancock, the mold Singh encountered did not "exceed[] what would normally be encountered during the routine maintenance of a normal residence." (Hancock Decl. Attach. 1, at 4.) Nevertheless, within a few weeks of receiving Singh's complaint, a housing unit staff member placed work orders for the Physical Plant crew to "clean, remove and seal the mold affected areas around the [tiles], holes and the handrails inside the handicap showers." (Singh Decl. ¶ 259.) Officials also advised staff members that they needed to ensure that the inmate workers responsible for cleaning the handicap shower were doing their job and to hold them responsible if they failed to do so. No reasonable juror could find that this response amounted to deliberate indifference.

As to Claim Three in Case No. 2:17-cv-00829-SB, the record reveals that Singh complained about the noise and lighting in his mini-dorm, an honor housing unit with twelve beds. Prison officials responded by offering to move Singh, and by explaining that the Physical Plant crew did not plan to make any adjustments to the dorm's entrance or windows because it is an open bay setting (which means that there will always be noise when staff or AICs enter or leave the mini-dorm), and that the lighting is necessary for the security staff to carry out their duties in a safe manner. After Singh continued to complain about the lighting and noise in the mini-dorm, Pedro moved Singh to celled housing, as opposed to an open bay, on the same unit, which resulted in Singh losing his job assignment for a few days. Pedro, however, took affirmative steps to ensure that Singh would be able to keep his job assignment. In light of this

record, the Court concludes that Defendants responded reasonably to Singh's complaints about the noise and lighting in his mini-dorm, and that prison officials had legitimate penological reasons for not altering the mini-dorm's open bay environment in response to Singh's complaints.

For all of these reasons, Defendants are entitled to summary judgment on Singh's conditions of confinement claims. *See Grenning*, 739 F.3d at 1239 (explaining that prison officials cannot be held "liable if they respond reasonably to the risk").

### C.    First Amendment Retaliation

#### 1.    Applicable Law

"Prisoners have a First Amendment right to file grievances against prison officials and to be free from retaliation for doing so." *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012) (citing *Brodheim v. Cry*, 584 F.3d 1262, 1269 (9th Cir. 2008)). The prohibition against retaliatory punishment for filing grievances is "clearly established law." *See Brodheim*, 584 F.3d at 1269 ("Retaliation against prisoners for their exercise of this right is itself a constitutional violation, and prohibited as a matter of 'clearly established law.'" (citing *Rhodes v. Robinson*, 408 F.3d 559, 566 (9th Cir.2005), and *Pratt v. Rowland*, 65 F.3d 802, 806 & n.4 (9th Cir.1995))).

"Within the prison context, a viable claim of First Amendment retaliation entails five basic elements[.]" *Rhodes*, 408 F.3d at 566. First, the plaintiff must show that "the retaliated-against conduct is protected." *Watison*, 668 F.3d at 1114 (citing *Rhodes*, 408 F.3d at 568). Second, the plaintiff must demonstrate that "the defendant took adverse action against the plaintiff." *Id.* (citing *Rhodes*, 408 F.3d at 567). Third, the plaintiff must establish "a causal connection between the adverse action and the protected conduct." *Id.* Fourth, the plaintiff must demonstrate that the "'official's acts would chill or silence a person of ordinary firmness from future First Amendment activities.'" *Id.* (quoting *Rhodes*, 408 F.3d at 568). Fifth, the plaintiff

must show that the prison official's "'retaliatory action did not advance legitimate goals of the correctional institution.'" *Id.* (quoting *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985)).

### 2.    Analysis

Three of Singh's remaining claims appear to allege that Defendants retaliated against him for filing grievances: (1) Claim Two in Case No. 2:16-cv-01957-SB, which is based on the grievance about the mold on Singh's cell wall and near his sink; (2) Claim Two in Case No. 2:17-cv-00829-SB, which is based on the grievance about the treatment of Singh's skin rash; and (3) Claim Three in Case No. 2:17-cv-00829-SB, which is based on the grievance about the noise and lighting in Singh's mini-dorm. (*See* Defs.' Mot. at 4, identifying an unenumerated claim related to Singh "being moved from cell 9-39B to 11-4A"; Singh Decl. at 41, asserting that Defendants retaliated against Singh after he complained about the treatment of his skin rash; Singh Decl. ¶¶ 355, 363, reflecting that Singh accused Pedro of "threatening" to move him out of the mini-dorm if he did not rescind his initial complaints about the lighting and noise).

Singh has failed to establish a causal connection between any protected conduct and an adverse action. Singh has also failed to demonstrate that any of Defendants' actions would chill or silence an individual of ordinary firmness from engaging in future First Amendment activities. *See, e.g.*, *Harrison v. Milligan,* No. 09-cv-04665, 2010 WL 1957389, at *2-3 (N.D. Cal. May 14, 2010) (explaining that the defendant's conduct must be "of sufficient severity that . . . [it] would chill or silence a person or ordinary firmness from future First Amendment activities" (citing *Mendocino Env't. Ctr. v. Mendocino Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999))).

With respect to his mold grievance, although Singh claims that officials retaliated against him by moving him from his cell after he complained about mold, the record reveals that prison officials moved Singh from his cell in housing unit nine because they dispatched crews to clean the mold in Singh's cell and to seal and caulk any areas to prevent any mold growth. (Singh Ex.

6, at 4; Singh Decl. ¶¶ 143-49.) As to the treatment of Singh's skin rash, Singh appears to allege retaliation simply because he disagreed with the diagnosis and recommended course of treatment (allergy medications, an inhaler, and hydrocortisone cream). Such a disagreement does not support a finding of retaliation.

Finally, Singh claims that Pedro threatened to move him if he did not rescind his initial grievance related to the noise and lighting in the mini-dorm. Pedro denied that he threatened to move Singh if he refused to withdraw his grievance, and explained that he merely suggested that Singh withdraw his grievance after Singh asked to remain in the mini-dorm. Even if a factual dispute exists about Pedro's alleged threat to move Singh, a move from the open bay mini-dorm, about which Singh consistently complained, to a cell within the same honor housing unit, would not chill or silence an individual of ordinary firmness from engaging in future First Amendment activities. In any event, Singh also has not demonstrated any adverse action resulting from the move, as Pedro took affirmative steps to ensure that Singh did not lose his job.

In sum, the Court concludes that Singh has failed to present any evidence that would rise to the level of First Amendment retaliation, and therefore grants Defendants' motions for summary judgment.

## CONCLUSION

For the reasons stated, the Court GRANTS Defendants' motions for summary judgment (ECF Nos. 79, 109, 174), and DENIES Singh's renewed motions for a court-appointed expert (ECF Nos. 127, 157, 223).

**IT IS SO ORDERED.**

DATED this 30th day of November, 2020.

_Stacie F. Beckerman_

_____
HON. STACIE F. BECKERMAN
United States Magistrate Judge